

**IN THE
TENTH COURT OF APPEALS**

**No. 10-19-00335-CV**

**IN THE INTEREST OF A.F., A.F., AND A.F., JR., CHILDREN**

**From the County Court at Law
Ellis County, Texas
Trial Court No. 99334CCL**

## MEMORANDUM OPINION

This termination-of-parental-rights proceeding originally involved six children—"Jeff," "Linnie," "Rod," "Heather," "Fuller," and "Brooke."[1] During the course of the proceeding, the trial court severed the cases relating to Jeff, Rod, and Brooke from this case. The case as to the termination of the parental rights of "Kate," the mother, to Linnie, Heather, and Fuller (ages 11, 9, and 7, respectively) proceeded to a bench trial. After the bench trial, the trial court signed an order terminating the parental rights of Kate to

---

[1] To protect the children's identities, we use aliases to refer to the children, their parents, and other family members. *See* TEX. R. APP. P. 9.8(a), (b). Furthermore, to the extent possible, we use the aliases selected by the parties in their briefs.

Linnie, Heather, and Fuller.[2]  The trial court found that Kate had violated Family Code subsections 161.001(b)(1)(D), (E), (O), and (P) and that termination was in each child's best interest.  Kate appeals in six issues.[3]  We will affirm.

## The Evidence

Jeshayah Refuge-Lozada, an investigator for the Department of Family and Protective Services (the Department), testified that Kate's history with the Department began in June 2009 when the Department received a report of neglectful supervision of Jeff, Linnie, and Rod by Kate and of physical abuse of Rod by Kate.  The essence of the investigation involved alleged marijuana usage and alcohol abuse by Kate during her pregnancy with Rod.  The allegations were eventually ruled unable to determine, but the investigation uncovered that Kate admitted to smoking marijuana while pregnant.  As a result, Kate was referred to Family Based Safety Services (FBSS).  Kate was not compliant with the services until about January 2010 when she did about three weeks of services, including attending Narcotics Anonymous and applying for employment.  The case was closed at that time.

Refuge-Lozada testified that the Department received the next referral regarding Kate on August 14, 2010.  The allegations at that time were neglectful supervision of Jeff, Linnie, and Rod by Kate and of physical abuse of Heather by Kate.  The essence of the

---

[2] The parental rights of Linnie's and Heather's father, "Lars," and Fuller's father, "Dario," were also terminated, but neither Lars nor Dario has appealed.

[3] Kate identified Rod and Brooke and did not identify Fuller in the style of her notice of appeal; however, it appears that Kate intended to appeal from the final order of termination, signed by the trial court on September 16, 2019, which terminated her parental rights to Linnie, Heather, and Fuller.  Accordingly, we have changed the style of this appeal to *In the Interest of A.F., A.F., and A.F., Jr., Children*.

investigation involved Kate testing positive for marijuana when she gave birth to Heather. During the investigation, Kate again admitted to using marijuana. Kate was therefore referred to parenting and drug-education classes, but she did not attend those classes and did not cooperate with the investigation. The allegation of neglectful supervision of Heather was eventually given the disposition of reason to believe.

Refuge-Lozada testified that the Department then received the next referral regarding Kate on March 5, 2012. The allegation at that time was neglectful supervision of Fuller by Kate, which involved Fuller testing positive for marijuana at the time of his birth. The allegation was eventually ruled unable to determine, but during the investigation, Kate admitted to using marijuana during her pregnancy with Fuller even though she had already received FBSS services about the dangers of using marijuana while pregnant and was therefore fully aware of the risk to her unborn child. Kate was again referred to FBSS at that time, but Refuge-Lozada does not believe that Kate successfully completed all of the services.

Refuge-Lozada testified that the Department then received the next referral regarding Kate on December 12, 2013. The allegation at that time was medical neglect, but it was eventually ruled out.

Waxahachie Police Officer Dustin Koch testified that he then took a terroristic threat report from Kate in May 2017. Kate reported to him that on that date, she and Lars had been involved in an altercation and that five of her children had witnessed the incident. Kate reported that Lars had pulled her off of the porch by physically grabbing her by the neck and shoulders. Kate further reported that Lars had threatened to blow

up her house—the residence where she lived with her children—and that she believed that Lars had the means to do so. A witness with whom Officer Koch also spoke thereafter confirmed what Kate reported about the incident.

Refuge-Lozada testified that the Department then received the next referral regarding Kate on January 31, 2018. The allegations at that time were neglectful supervision of Linnie and Heather by Kate because Kate was allegedly using drugs, pills, and cocaine. During the investigation, Kate tested positive for THC. Refuge-Lozada believes that Kate was nevertheless not referred to services and that the case was closed because Kate "had a very active support network. Her family was involved and was helping her meet the needs of the children."

Waxahachie Police Officer Abe Partington testified that he then responded to Kate's home on July 21, 2018, after a child called 911 reporting domestic violence. According to in-house records, there had been multiple prior calls regarding domestic violence between Kate and a man whom she was dating at the time, "Donald." Officer Partington testified that he is very familiar with Donald because he has arrested him "numerous times." In fact, the week before responding to Kate's home, Officer Partington had arrested Donald for possession of marijuana and unlawful carrying of a pistol. Officer Partington testified that he is similarly familiar with Kate because she has been a victim in several cases that he has filed.

Officer Partington testified that on the evening of July 21, 2018, "[t]he call came out as the vehicle was leaving [Kate's] residence with the front windshield being knocked out." Officer Partington saw Donald driving down the road in the vehicle and conducted

a traffic stop based on the call. Donald appeared to Officer Partington on that evening to be "the same way he always is"—"worked up and not all there." Officer Partington believes that Donald was under the influence of PCP because Donald is a known PCP abuser and because Donald has a violent, aggressive demeanor when he is under the influence of PCP.

Officer Partington testified that after conducting the traffic stop, he spoke with Kate and asked her what had happened. Kate appeared to Officer Partington to have been "[b]eaten up," and Kate told Officer Partington at that time that she had been "beat[en] up" by Donald. Kate said that she had been punched in the face and dragged through the front yard. Kate indicated that the fight had started at the house and then continued out into the yard. At trial, Officer Partington did not recall if Kate had told him why she and Donald had gotten into an argument that evening, but Officer Partington testified that Kate did mention to him that evening about Donald selling drugs in front of her house.

Officer Partington testified that Kate's children had also been in the home when the incident happened on July 21, 2018. Officer Partington talked to the children, and they told him the same thing that Kate had—that Kate had been punched in the face and dragged through the yard. At trial, Officer Partington specifically recalled speaking to a female child who had been able to describe to him "in perfect detail" what had happened. Officer Partington answered, "Yes," when asked if the child was able to physically demonstrate what it looked like when Donald dragged her mother across the yard while

punching her mother in the head. Donald was arrested on the evening of July 21, 2018 and charged with continuous family violence, among other things.

Refuge-Lozada testified that following the July 21, 2018 incident, the Department received a referral alleging neglectful supervision of Linnie and Heather by both Kate and Donald related to domestic violence. There were also allegations at that time that crack was being sold out of the home by Donald and that the living conditions in the home were "horrible." Refuge-Lozada was assigned as the Department's investigator regarding the allegations.

Refuge-Lozada testified that during her investigation, she spoke with Kate about Donald and the domestic-violence allegations. At that time, thirty-three-year-old Kate told Refuge-Lozada that she had been seeing seventeen-year-old Donald for about seven months to one year. When asked if Donald had still been a juvenile when Donald and Kate "got together," Refuge-Lozada replied, "Yes." Refuge-Lozada then testified that Kate acknowledged to her that she and Donald argued a lot and that there had been domestic violence between them. Kate first described an incident that happened in June 2018 in which Donald forcefully pushed her in the face. Kate said that the children were not around for that incident. Kate acknowledged to Refuge-Lozada, however, that the children had witnessed the domestic-violence incident in July 2018 that had led to the Department's involvement. Refuge-Lozada stated:

> So [Kate] said that argument began when her landlord told her [Donald] couldn't live in the home any more because he wasn't on the lease and he had broken a window. So she said she told [Donald] this and started packing up his clothes. He was upset by this and started unpacking [the] clothes and told her youngest child something to the effect of, why is your

mom saying stuff like this. Then he started fighting her. She said while [Donald] was fighting her, she curled herself up in a ball and he continued to hit her. She also said that [Donald] bit her on her cheek, and that, at some point during the fight, while they were fighting inside, she threw hot grease at [Donald], but he closed the door. So some of the grease splashed back on her. When they were fighting outside, which the children also were outside during this time, [Donald] swung at her while she was standing on the porch and it did hit her. And when they were fighting [Linnie] also tried to intervene in the fighting and was hitting him with a broom.

Kate told Refuge-Lozada that the children were yelling "stop" while the fight was going on and that one of the children had actually called the police.

Refuge-Lozada testified that the children largely confirmed Kate's story about the domestic-violence incident. Specifically, Refuge-Lozada stated:

> [Rod] . . . told the forensic interviewer that [Donald] was punching his mom and pulling her by the hair and saying, stop playing with me. He said that his mom had also threw a brick at the car during the incident of domestic violence and that his mom had tried to pour grease on [Donald]. And he said that when they were fighting  - -  when [Donald] and [Kate] were fighting outside, that he and his siblings were also outside watching the fight.
>
> . . . .
>
> [Fuller], during his interview, he went back and forth as if he couldn't quite keep the story straight. He would say that . . . [Donald] . . . hit his mom. But then he'll go back and say, but he really didn't hit his mom. But then he'll say, [Donald] just said stop playing with me, but didn't hit his mom. [Linnie] thought [Donald] hit his mom, that's why she called the cops.

Linnie wrote a statement to the police about the July 21, 2018 domestic-violence incident, confirming what Kate had said had happened, but Linnie then told the Department something different than what she had told the police. Refuge-Lozada testified that when Linnie was interviewed during the Department's investigation,

[s]he denied there was any fighting in the home. She said everyone got along great. She denied anyone argued. She denied ever calling the police to the home. When she was confronted with the information that we knew the police had been called to the home, she said, oh, when I go to sleep and wake up, I just forget things.

Based on the discrepancy between Linnie's two versions, Refuge-Lozada believed that Linnie was coached before her interview with the Department.

Refuge-Lozada next testified that while investigating the drug allegation, Kate confirmed to her that Donald sold drugs by the tree in front of his mother's home. Kate also indicated to Refuge-Lozada that she knew that Donald both smoked and sold marijuana. Moreover, Kate herself was drug tested during the investigation, and her urinalysis was positive for methamphetamines. The Department had also requested at that time that Kate take a "hair follicle test," but she did not have enough hair to perform the test. Refuge-Lozada was informed by the drug-testing service that it appeared that Kate had shaved off all of her hair.

Refuge-Lozada testified that during the investigation, Kate further acknowledged her suspicions about Donald being involved in a murder. Kate told Refuge-Lozada that Donald's name "kept coming up" in association with the murder and that when she tried to ask Donald about it, he would just get angry and aggressive. Kate therefore stopped asking about it.

Refuge-Lozada testified that despite what Kate knew about Donald, however, Kate had indicated from the very beginning of the case that she intended to continue a relationship with Donald. For instance, during the investigation, Refuge-Lozada attempted to enter a safety plan to keep Donald away from the children, but when

Refuge-Lozada was talking to Kate about it, Kate said that once the Department closed the case, she would not have to follow the safety plan anymore and that Donald would again be allowed around the children. Refuge-Lozada thus opined at trial that Kate failed to appreciate the danger posed to the children by Donald being a part of their lives.

Finally, regarding the condition of the children's home environment with Kate, Refuge-Lozada testified that she discovered the following during her investigation:

> It was - - it was very dirty when I went there. I actually had scheduled the home visit. So [Kate] was aware I was going to be there the day I had went to visit the home. So when I arrived at the home, I immediately noticed the broken windows in the home and the glass laying in the front yard. When [Kate] gave us permission to enter the home, the living room, it was very empty. They had minimal furniture in the home. The kitchen, they didn't have much to eat in the home. There was very minimal food for the amount of people living in the home. There was only one bed in the home for the amount of children living in the home. They only shared one full-size mattress that was very dirty, very stained, very dirty. The closets were very cluttered, very full of stuff. It was as if it was a rush job to clean up. Everything was shoved in the closets. All the walls were dirty, like they had dirt and grime buildup on them. The bathroom was also dirty with dirt and grime buildup. The back room of the home had animal feces and urine in it. The home smelt like animal and urine feces. There was also broken furniture in the back room of the home.

Refuge-Lozada stated that the smell in the home was so "awful" that she had to "walk out of the home to breathe because [she] felt like [she] was going to throw up." When she was eventually asked at trial if she believed that the home environment was a safe or sanitary place for the children to live, Refuge-Lozada replied, "No."

Refuge-Lozada testified that following her investigation, all of the allegations in this case—neglectful supervision, physical abuse, and physical neglect—were given the disposition of reason to believe. Department caseworker Veronica Rayfield then testified

that the Department was granted temporary managing conservatorship of the children on September 27, 2018. Refuge-Lozada stated that the Department then located a placement for each child at that time.

Rayfield testified that Kate was notified at that time by the trial court in the temporary orders and in the family service plans what she needed to do for the children to be returned to her. Specifically, Kate was required to successfully complete individual counseling, parenting classes, substance-abuse counseling, a psychiatric evaluation, a substance-abuse assessment, a domestic-violence intake assessment, a substance-abuse program, and a psychosocial assessment. Kate was further required to maintain full-time employment, to obtain and maintain safe and stable housing, and to make efforts to obtain a driver's license.

Rayfield testified that overall, Kate completed some of the requirements but that she also failed to complete a number of the services. Specifically, Rayfield stated that Kate completed her psychosocial assessment on October 25, 2018. At that time, Kate recognized that she needed help. Kate acknowledged that domestic violence had occurred in her intimate relationship, that she had a substance-abuse issue, and that her mental-health status needed to be evaluated. Pursuant to her evaluation, Kate "was diagnosed with cannabis dependence, domestic violence incident, [and] CPS involvement." Kate's treatment plan was for her "to address her substance abuse history, to learn how to communicate in a healthy relationship without domestic violence, and to parent her children and learn and understand how domestic violence can affect her

children's behavioral health and emotional health." The Department referred Kate to a counselor to assist her with those recommendations.

Rayfield testified that Kate began attending individual counseling sessions with the referred counselor in October 2018. Kate regularly attended the sessions except when she missed one session in December 2018, one session in January 2019, and one session in March 2019. Kate completed eighteen total sessions but was then unsuccessfully discharged in April 2019 because the counselor determined that Kate was unable to resolve several safety issues. Kate's remaining problem areas included maintaining a drug-free lifestyle, obtaining housing for herself and her children, and refraining from any relationships that involved physical violence. The Department thereafter re-referred Kate for additional counseling with a different counselor. That counseling was scheduled to begin on August 13, 2019, but Kate missed her session without calling and was released by the counselor at that time. Kate therefore failed to complete her individual counseling.

Rayfield testified that Kate also failed to complete a psychiatric evaluation. Kate was scheduled to complete the evaluation at the Child and Family Guidance Center known as ADAPT, but she did not engage in any services with the Center. Kate did, however, eventually complete a substance-abuse screening with Outreach Screening Assessment and Referral (OSAR) on March 11, 2019. Kate had initially been scheduled to complete it on November 5, 2018, but she had not shown up for the appointment. The recommendations from the substance-abuse assessment were that Kate follow any Department recommendations and that she complete intensive outpatient services with Dallas Metrocare. Kate was therefore provided with all of the information that she

needed to follow up with Dallas Metrocare.  But Kate did not follow up.  To Rayfield's knowledge, Kate did not complete any substance-abuse program and did not engage in any substance-abuse treatment throughout this case.

Rayfield agreed at trial that substance abuse has been a concern throughout Kate's history with the Department and that it continued to be a concern in this current case. The Department therefore requested that Kate submit to random drug testing, and the trial court ordered Kate to comply with the Department's requests for random drug testing.  Rayfield testified as follows about the results of those drug tests:

> In October of 2018, I sent [Kate] for a UA [urinalysis] and a hair follicle test.  She tested positive for meth on her UA, but did not complete her hair follicle.  And on November 15th, 2018, she tested positive via UA for meth and her hair follicle tested positive for methamphetamines, cocaine, and amphetamines.  And then [on] November 27th, 2018, [Kate] admitted to her counselor . . . at the time that she had popped an Ecstasy pill and that's why she tested positive for the drug test on November 15th.

> And then she also completed one after her visitation in April of 2019. Her UA was positive for meth and her hair follicle was positive for amphetamines and methamphetamines.

> [On] May [23], 2019, [Kate] admitted to me that she had tested  - - that she had popped an Ecstasy pill again and that's why she tested positive.

Rayfield additionally stated at trial that Kate had failed to appear for sixteen requested drug tests.  Twice, the trial court had actually ordered a drug test on the day of a hearing, yet Kate still failed to appear.  Rayfield thus agreed at trial that it is fair to say that Kate still has substance-abuse safety issues.

Rayfield testified that Kate also did not participate in a domestic-violence assessment.  Kate was referred to the Genesis Women's Shelter for the domestic-violence

assessment. Kate thereafter contacted the shelter in June 2019, stating that she needed to engage in domestic-violence counseling. But Kate did not follow through with the domestic-violence assessment after it was scheduled to be completed on June 28, 2019. The Department was concerned that Kate was still maintaining a relationship with Donald at that time. Kate had informed Rayfield that she and Donald were just friends and that they were not together, but Kate had visited Donald while he was incarcerated from July 2018 to January 2019, and Kate then reported being assaulted again by Donald.

Joshua Goodwin, a public safety officer for the Waxahachie Police Department, testified that on June 13, 2019, Kate came into the police department to make a report about an assault that had occurred that morning in which Donald was the alleged perpetrator and Kate was the alleged victim. Kate reported to Goodwin that she had previously terminated her ongoing dating relationship with Donald but that they had still been communicating through Facebook Messenger and that Donald had wanted to meet to talk to her. Kate said that she had initially denied Donald's request to meet but that she had finally given in to him. Kate showed Goodwin the messages to corroborate her statements. In those messages, Donald had promised that he would not hit Kate.

Goodwin testified that Kate then reported that at about 3 a.m., she had driven to meet Donald at "the tree," "a known place on East Jefferson where a lot of people hang out." Donald had said in the messages that he was going to smoke "a blunt," *i.e.*, marijuana, while he and Kate talked in the vehicle. Kate reported to Goodwin that she had been in her vehicle with another man earlier in the night and that Donald was asking her who it had been and why she had been with him. Kate said that she felt like it was

not important to answer Donald because she and Donald were no longer in a dating relationship. Kate stated that Donald then struck her in the face with a closed fist, causing her pain. Kate indicated that Donald also took her car keys so that she could not leave. Kate had left her phone at home because she had anticipated that Donald would take it from her.

Goodwin testified that in the messages, Kate later confronted Donald about the fact that he had promised that he would not hit her and yet he had. Goodwin stated that Donald did not directly admit at that time that he had lied. Instead, when Kate pointed out to Donald that he had said that he was not going to hit her but that she had a bruise, of which she sent Donald a photo, Donald replied by sending "a crying face."

Goodwin then testified that Kate stated that she did not provoke Donald to strike her this time, unlike in the past, and that she therefore wanted to press charges against him. The detective on the case thereafter had a warrant issued for Donald. Officer Partington testified that he was involved in June 2019 in attempting to serve Donald with a warrant for a continuous-family-violence charge in which Kate was the victim. Officer Partington opined at trial that based on his interactions with Donald, he did not believe that Donald was a safe person to have around young children.

Rayfield then continued to testify about how Kate had failed to complete several of the requirements for her children to be returned to her. Kate had been ordered to provide the Department with a current address and telephone number, but, in Rayfield's opinion, Kate had failed to do so. Kate had informed Rayfield that she was living with her aunt in Waxahachie, but when Rayfield made attempts to meet Kate there in August

2019, nobody was there. Kate also never provided an alternate address where she might be staying throughout this case. Rayfield had therefore not had any opportunity to evaluate Kate's last home environment.

Jeanne Odle, the CASA representative and guardian ad litem for the children in this case, testified that she had tried to keep up with Kate's housing status. Odle had picked up Kate once at her aunt's address. At some point later, Kate had then indicated to Odle that she was homeless, and Odle had then picked up Kate at a hotel. Odle explained at trial that Kate had difficulty obtaining housing because about six years before, she had left an apartment without paying. Odle also stated at trial that she did not believe that Kate was still living with her aunt; instead, Odle believed that Kate was currently living "with a lady here in Waxahachie."

Rayfield testified that in addition to housing issues, Kate also experienced some transportation issues during this case. In February 2019, a transportation issue caused Kate to miss a scheduled visit with the children. Rayfield testified:

> [Kate] informed me she needed a ride from her job to the office and from the office back to her residence. I reported to her that I could only provide her transportation from her job to the office due to me and two other coworkers transporting her children back to their placements. So she cancelled that visitation.

In March 2019, the Department thus offered Kate transportation to all of her services, but Kate did not accept the offer. Odle testified that even though the Department had set up transportation for Kate, Kate had called her and asked if she would take her to the OSAR assessment, which Odle did. Odle stated that at the beginning of the case, she had also driven Kate once a month to visitations with her eldest son, which was a three-hour

roundtrip. Rayfield testified that despite these transportation issues, however, Kate never obtained a driver's license, and, in fact, Rayfield was not aware of any efforts that Kate made to obtain a driver's license.

Rayfield testified that during this case, Kate also maintained full-time employment in only December 2018 and January 2019. Rayfield acknowledged that Kate claimed that she was working at other times but explained that, except for December 2018 and January 2019, Kate did not send her any check stubs or other verification of employment. Rayfield further testified that even though Kate had paid some of the child support and medical support that was required of her in this case, she still owed about $440 as of August 2019.

Rayfield then testified that as for maintaining contact with the children during this case, Kate completed thirty-six of thirty-eight visitations. Rayfield acknowledged that that shows a certain level of consistency when it comes to visitation. When asked if there were any angry outbursts or behavioral issues during the visitations, however, Rayfield replied:

> Yes, in June. June 13, 2019, [Kate] walked out of her visitation. Specifically, [Brooke] and [Linnie] informed her that their permanency goal had changed from family reunification to adoption. And that's when she started yelling and telling the kids, well, they ain't told me nothing and I'm the momma, and this, this, this, and this. So I knocked on the door and told her if she couldn't control herself, then her visit would end. So that's when she gathered her belongings and she said, you don't have to tell me nothing. And so she walked out of the visit. [Brooke] and [Linnie] were crying. [Rod], he was there. He was just staring off into space. [Fuller] did look a little sad though. After she walked out, I followed her to the lobby and said I needed to talk to her. And that's when she said, you don't have to talk to me about nothing.

> And then there was [an] incident in June. On June 20 of 2019 . . . . That's when Step One had tried to drug test her at the office as well. She

didn't want to drug test that day. She was yelling, being very disrespectful. My coworker . . . heard her from the other side of the building yelling and came to check in on the visit to make sure that things were okay.

> And then on August 8th, I asked [Kate] to leave the visitation. [Fuller] came in and [Kate] had asked him how are things going at his foster home. And [Fuller] stated, well, I can't tell you. So [Kate] got upset and she told the children that they were going to die in the system. So I knocked on the door and I gave her a warning. And I said, you know, you can't speak like that. I'm just going to let you know, you can do that, one more warning and then you're going to have to leave. And so I went back into the observation room and that's when she told the children, well, she needs to be a better caseworker. And so I knocked on the door and I told [Kate] that she had to leave.

Rayfield stated that on that last occasion, the children were trying to help Kate by continuing to "shush her. They said, shh, Momma, shh." Brooke and Linnie then cried just like the other times when Kate had walked out, and Heather said "why does it always have to be like this."

Odle similarly testified that she had observed twenty-eight of the thirty-eight visitations in this case and that she also had some concerns based on those visits. Regarding the June 13, 2019 visitation, Odle was walking into the Department's office at the same time that Kate was leaving. Odle explained that she went back to where the children were and had to help console them because they were "terribly upset." Odle also recalled an incident that occurred during a visitation when the children had said something to Kate that she did not like, which caused Kate to start "rambling on" about Rayfield and the Department. Odle admitted at trial that she could understand why Kate may have had an issue that day with what the children were saying. But Odle did not

agree with the way Kate reacted. Odle said that Rayfield ultimately decided not to stop the visitation that day but that "it was hard to watch."

When Odle was then asked if she ever had any concerns with Kate doing the things that she needed to do for the children during her visitations with them, Odle replied that the children were always hungry at the visitations because they had just come from school but that Kate was not always able to bring the children food. Instead, Kate would sometimes tell the children that she would bring them something when she got paid. This concerned Odle in that she wondered if Kate might not be in a position to feed the children on a full-time basis. Odle later acknowledged that she believed that some of the failures or difficulty that Kate has had in this case stemmed from her economic status. But Odle stated that she did not know how to speculate whether Kate "would just arbitrarily neglect her children and just not provide for them" economically if she made more money.

Rayfield then testified that there have been issues recently with Kate's mental health. Odle stated at trial that she had a recent text-message conversation with Kate that was concerning. Odle explained what happened as follows:

> We were texting. . . . And then [Kate] started talking to me, texting me about how sad she was that she didn't know that she could make another day without her children. She didn't have her children to give them away. She said her mom and daddy would be rolling over in their graves and that she just couldn't go on another day. I tried talking to her but it progressed and when she wrote me about her funeral and then wrote me to make sure she was cremated - - excuse me. . . . Give each of her children ashes, I just got scared. I was worried about her. So I made a call because I wanted her - - I was asking her, are you by yourself, can you go to the hospital, can you go be with a friend, can you call your counselor, you need to be with someone. And she just kind of kept on being negative.

Rayfield testified that she received a call about Kate's text messages indicating that Kate might be suicidal. On September 5, 2019, the Red Oak Police Department were thus sent to perform a welfare check at Kate's address and at a rehabilitation center where Kate claimed that she was working. Rayfield was informed that a police officer had escorted Kate from her employment to Dallas Behavioral Hospital but that Kate was not actually admitted to the hospital.

In addition to the foregoing testimony that focused on Kate, there was also significant testimony about the three children that are the subject of this case—eleven-year-old Linnie, nine-year-old Heather, and seven-year-old Fuller. First, Rayfield testified that Linnie had a psychological evaluation on January 5, 2019. Pursuant to the evaluation, Linnie was diagnosed with adjustment disorder, a learning disorder, and "neglect of a child." It was also determined that Linnie had witnessed domestic violence, criminal activity, and substance abuse in the home. It was therefore recommended that Linnie "receive a psychiatric evaluation, continue her counseling regimen . . . , [receive] consistent structure, encouragement, nurturing, and frequent redirection[,] and [maintain] a daily routine." Following the psychiatric assessment, Linnie was then also diagnosed with disruptive mood dysregulation disorder (DMDD), major depressive disorder (MDD), and night terrors. Linnie takes several medications, which are evaluated every two weeks by a psychiatrist, to treat these issues. According to Rayfield, the medications appear to be helping Linnie.

Rayfield testified that Linnie has had multiple placement changes during this case. Her initial placement lasted from September to December 2018. She was then placed in a foster home from December 2018 to May 2019. She was then moved to another foster home before being placed in her current foster home. Rayfield acknowledged at trial that the placement changes have been hard on Linnie and that Linnie has stated that she would like to return to her mother's care. Rayfield nevertheless stated that Linnie is "doing okay" in her current foster home, and Rayfield believes that the foster home is meeting all of Linnie's needs. According to Rayfield, Linnie has had days where she has required more attention or frequent redirection, but her behavior overall has improved since going into the Department's care.

Rasheda Warren, a licensed professional counselor who had seen Linnie and Heather weekly and Fuller biweekly for over a year, testified that her recommendations for Linnie are continued therapy, a stable home life, involvement in a mentorship program, and a concentration on Linnie's education. Warren stated that Linnie has been becoming better able to control her emotions but that during this case, she has seen Linnie "at a place where she has dissociative behavior and psychotic breaks." During her first "break," Linnie was trying to process the death of someone whom she loved and cherished. Through journaling and therapy, Linnie was eventually able to accomplish emotional stability. Thereafter, Linnie experienced another "break" when she moved to a new placement, but after the break, Linnie was eventually able to "come to reality" through therapy.

Warren testified that she has also focused on emotional regulation with Linnie because Linnie can become agitated and aggravated with Heather. Linnie and Heather have issues with one another, and Heather can sometimes be aggressive with Linnie. Warren opined that the main source of the constant conflict between them is their competition to receive love and attention from Kate. According to Warren, Linnie believed that Kate was working the services and doing her best to get back all of the children. Linnie had even written her mother a letter urging her to do whatever was needed to get back all of the children.

Odle confirmed that Linnie has always wanted to return home to Kate. According to Odle, Linnie has even stated that she does not want to be adopted and would stay in the system until she is eighteen years old. Odle believes, however, that this stems from Linnie's loyalty toward her mother. Odle believes that Linnie's position might change if Kate's rights were terminated. Odle believes that the permanency of termination would allow Linnie to consider something different, and Odle also feels like Linnie would be open to adoption if it were someone whom she felt really cared about her.

Rayfield testified that Heather also had a psychological evaluation on January 5, 2019. Pursuant to the evaluation, Heather was diagnosed with "adjustment disorder a mixed disturbance of emotions and conduct, learning disorder with impairment in math, neglect of child history, chaotic home environment, witness to criminal activity and domestic violence and substance abuse in the home." It was therefore recommended that Heather participate in daily activity, continue with her counseling regimen, have a psychiatric evaluation, and receive frequent redirection, consistent structure, nourishing,

and encouragement. Following the psychiatric evaluation, Heather was then also diagnosed with disruptive mood dysregulation disorder (DMDD), major depressive disorder (MDD), and attention deficit/hyperactivity disorder (ADHD). Heather takes several medications, which are evaluated every two weeks by a psychiatrist, to treat these issues.

Rayfield testified that Heather has also had multiple placement changes during this case. Like Linnie, Heather's initial placement lasted from September to December 2018. She was then placed in a foster home from December 2018 to May 2019. She was then moved to another foster home before being placed in her current foster home. The placement changes have been very difficult for Heather, but Heather has stated that she does not want to return to her mother's care. She confided in one of her therapists that she feels like her mother does not love her the same way that she loves the other children, and during her second placement, Heather stated that she was open to being adopted. Heather has also said that she does not like being separated from Linnie in the foster home even though Linnie is sometimes mean to her and does not want to play with her. Rayfield believes that Linnie and Heather are "well bonded" even though they are currently in a "huge disagreement" because Linnie wants to return to Kate's care and Heather does not.

Warren, as Heather's counselor, testified that Heather's main issue is her inability to regulate her emotions. In all of her foster homes, Heather has also been suffering from "encopresis and enuresis daytime and nighttime." Heather told Warren that she did not have these issues before coming into foster care, but Linnie said that she did. Rayfield

testified that Heather's behavior has gotten worse since she has been in the Department's care. Warren similarly stated that Heather's behavior has intensified to a degree.

Warren testified that she believes that Heather has had a severe reaction to trauma in her life. Warren believes that Heather "has been exposed to some type of sexual trauma based on a couple months ago when she was caught playing house." Warren further stated: "[Linnie] said that she has witnessed sexual behavior, but it was with her mom having sexual contact with a male. That's what [Linnie] said. . . . [Heather], I'm saying, has had some type of sexual exposure, whether it was done to her due to the behaviors that she has."

Warren testified that her treatment of Heather begins with lowering Heather's tension and anxiety through calming techniques like deep breathing and mindfulness. Warren then discusses past behaviors with Heather. Warren lets Heather explain what happened from her point of view and then discusses with Heather what other choices she could have made. The goal is to lead Heather to a place of understanding and acceptance of the consequences of her behavior. Warren stated at trial that she believes that Heather needs a caregiver who can engage in a similar dialogue with her to help her manage her behavior. Heather also needs someone who is nurturing and reassuring because her self-esteem is very low. Warren's recommendations for Heather are that she needs to continue behavior therapy, undergo a forensic interview to determine if she has had any type of sexual exposure, and have a stable environment that reduces systemic trauma.

Rayfield then testified that Fuller also had a psychological evaluation on December 28, 2018. Pursuant to the evaluation, Fuller was diagnosed with "[a]djustment disorder with mixed disturbance of emotions and conduct." Fuller also had the same findings as Linnie and Heather regarding chaotic home environment, exposure to substance abuse in the home, and witness to domestic violence. It was therefore recommended that Fuller participate in daily activity, begin a counseling regimen, and receive frequent redirection, consistent structure, nurturing, and encouragement.

Rayfield testified that like Linnie and Heather, Fuller has also had a history of significant placement changes. Fuller was initially placed with a relative from September to December 2018. From December 2018 to August 2019, Fuller was then placed in a foster home with his brother Rod. Fuller was then moved to his current placement with his paternal grandmother in August 2019. Before being placed with his paternal grandmother, Fuller stated that he wanted to return to his mother; however, since Fuller has been placed with his paternal grandmother, he has stated that he wants to remain there.

Warren, Fuller's counselor, testified that Fuller has some behavioral issues and problems regulating his emotions. Warren stated:

> I think there is some cognitive delay particularly with processing. I'm not sure about his birth history. Developmentally, he appears challenged, as far as, wanting to regulate his emotion, he knows what to do. However, he struggles in it and I think it has to do with his cognitive processing. I think that there is some delay there. And that's one of the concerns that I have for him. His cognitive delay is evidently - - is evident through - - he struggles to get dressed. He can be - - he has a problem expressing his emotions correctly.

But at the same token, [Fuller] shows remorse and that's very key because a lot of kids his age won't show remorse, but [Fuller] will show remorse and he's always trying to please. He will try to please whoever the adult is.

Warren testified that her recommendations for Fuller are that he be tested by a neuropsychologist, psychiatrist, pediatrician, or school psychologist. Warren explained:

I know that a psychiatrist can recognize that he does have some type of emotional, maybe some type of emotional diagnosis. I diagnosed him as having trauma-related stress. But I want him to get that because I feel that when he has that, he'll excel better academically. And then, you know, it'll just create awareness for those that are caring for him, that this is going to be a struggle for him.

Warren stated that Fuller would also benefit from additional skills training and from a mentorship program where he could observe a strong male figure.

Denise Robinson, a licensed professional counselor who uses play therapy, then testified that Fuller was also referred to her because he had been "diagnosed with [an] adjustment disorder[ ] with mixed conduct and mood which required some type of intervention therapy treatment." Robinson's initial impression of Fuller was that he "was cheerful. He was funny. He presented as a very cooperative child. I had no issues with his behavior during our play therapy session. There were sometimes when he would have a level of frustration, but overall, he functioned well in our sessions." Robinson stated that Fuller was making progress with his frustrations, but she believes that Fuller continues to need play therapy because he has a history of a chaotic lifestyle, separation issues, and academic challenges. Robinson testified that during one session, Fuller talked to her about domestic violence in Kate's home. Specifically, Fuller talked about a

shooting that occurred. He also talked about fighting that happened in the household, which appeared to distress him.

Robinson testified that she had seen Fuller only once since he was placed with his paternal grandmother but that after being placed with his paternal grandmother, Fuller's behavior appeared to have changed: "[Fuller] came in just so relaxed. He was just content, smile on his face, very good mood, just a happy child." When Robinson was asked if she believes that Fuller's placement with his paternal grandmother was a step forward in providing him the safety and security that he needs, Robinson replied, "Yes." Robinson believes that it is in Fuller's best interest to stay in his paternal grandmother's home at this time.

Robinson testified that for Fuller to be successful in the future, she recommends that he continue play therapy, have an academic evaluation, and participate in sibling therapy, family therapy, and trauma therapy. Robinson believes that Fuller needs trauma therapy specifically because of his history of separation from both his parents and siblings, as well as his history with domestic violence, drug abuse, and neglect. Without therapy, those things can have long-term effects on children.

Fuller's paternal grandmother then testified that Fuller has been doing well since he was placed with her. She has only observed small behavioral issues and nothing that she would describe as serious. She believes that Fuller is doing well in school, and she does not believe that he has any kind of learning delays. She thinks that he is just afraid and confused. She stated that she is happy with the placement but is not ready to adopt Fuller. She wants to allow his parents more time to get themselves together.

Odle testified that she does not necessarily agree with Fuller's paternal grandmother's assessment of him. Instead, Odle strongly believes that Fuller should undergo further academic testing. Fuller's former foster parents told her that they think Fuller has ADD or a learning disability, and Fuller had to repeat kindergarten. But one of Fuller's teachers believed that he should be tested to determine if he is gifted and talented. Fuller's teacher explained to Odle that Fuller is simply a tactile learner, which required her to adapt her teaching techniques.

Rayfield then testified that in conclusion, her request on behalf of the Department to terminate Kate's parental rights is not based on any evidence that Kate is economically disadvantaged. Instead, she believes that Kate has endangered her children by using illegal substances and by the domestic-violence incidences. Rayfield noted that the first domestic-violence incident occurred in June 2018 and that the second one occurred in July 2018. Rayfield explained that Kate had therefore allowed Donald back into her residence where her children were knowing that there was a possibility that domestic violence could occur again. And Kate did not sever the connection between her and Donald even then. Rayfield also explained that Kate has not alleviated any substance-abuse concerns that the Department had or any housing concerns that the Department had. Furthermore, Rayfield testified that she believes that termination of Kate's rights is in the children's best interest. Rayfield explained that Kate has been unable to utilize the resources that the Department offered her, including transportation to her services. Kate has also not been able to verify her financial situation or her living situation.

Rayfield testified that permanency and consistency is paramount in dealing with the children. Rayfield confirmed that Linnie's and Heather's current foster home has put in a request for the girls to be removed and that the girls are therefore going to be moved again. Rayfield further acknowledged that the Department has no long-term permanent placement for Linnie and Heather at this time. Rayfield testified, however, that if all parental rights were terminated, the Department would continue to seek appropriate family placements for the children. Rayfield believes that the Department will be able to locate an adoptive placement for Linnie and Heather. She is certain that an adoptive placement will be found because other children had found their forever homes after their parents' rights had been terminated and because the Department wants Linnie and Heather to have a forever home with a family that is stable enough to take care of them.

Odle testified that one of her concerns for the children is also permanency. Based on her involvement in this case, she does not believe that Kate can meet the children's needs. As the guardian ad litem, Odle therefore recommends termination of Kate's parental rights. Odle does not have any concerns about finding an adoptive home for Linnie and Heather. She would also like for sibling visits to continue.

### Sufficiency of the Evidence

In her second through sixth issues, Kate contends that the evidence is legally and factually insufficient to support the findings that she violated Family Code subsections 161.001(b)(1)(D), (E), (O), and (P) and that termination of her parental rights to Linnie, Heather, and Fuller was in each child's best interest.

In a proceeding to terminate the parent-child relationship brought under section

161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the petitioner bears the burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see C.H.*, 89 S.W.2d at 25.

### Statutory Predicate Grounds

In her fifth and sixth issues, Kate contends that the evidence is legally and factually insufficient to establish that she violated Family Code subsections 161.001(b)(1)(D) and (E).[4]

Termination under subsection 161.001(b)(1)(D) requires clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Termination under subsection 161.001(b)(1)(E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

---

[4] Because these issues are so interrelated in this case, we will address them together.

To endanger means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533.

> When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).
>
> It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by … leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Under subsection 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222

(Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).

> Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. [*In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)]; *see* TEX. FAM. CODE ANN. § 161.001[(b)](1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

Kate argues that the evidence is legally and factually insufficient to establish that she violated subsection 161.001(b)(1)(D) because the Department failed to prove a direct link or correlation between her actions and the children being knowingly placed or knowingly allowed to remain in conditions or surroundings that endangered their physical or emotional well-being. Similarly, Kate argues that the evidence is legally and factually insufficient to establish that she violated subsection 161.001(b)(1)(E) because the Department failed to prove that she engaged in any conduct that harmed the children. Kate asserts that instead, the record shows that the only "deliberate and conscious course of conduct" that she engaged in was poverty.

The evidence revealed, however, that there was domestic violence in the children's home, and domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *See In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.); *see also Sylvia M. v. Dallas Cty. Child Welfare Unit*,

771 S.W.2d 198, 201-04 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage, altercation during pregnancy, and mother's repeated reconciliation with abusive spouse). Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *K.A.S.*, 131 S.W.3d at 222; *see Ziegler v. Tarrant Cty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) (violent or abusive conduct by someone within household is environment that endangers children).

The evidence also revealed Kate's continuous illegal drug use, including while she was pregnant. A parent's illegal drug use and drug-related criminal activity may support a finding that the child's surroundings endanger his physical or emotional well-being. *In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied). And "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001[(b)](1)(E)." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195-96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child)). A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs. *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.). A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child. *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no

pet.) (mem. op.).

Considering all the evidence in the light most favorable to the trial court's findings and considering the evidence as a whole, we therefore conclude that a reasonable trier of fact could have formed a firm belief or conviction that Kate knowingly placed or knowingly allowed Linnie, Heather, and Fuller to remain in conditions or surroundings that endangered their physical or emotional well-being and that Kate engaged in conduct or knowingly placed Linnie, Heather, and Fuller with persons who engaged in conduct that endangered their physical or emotional well-being. We thus hold that the evidence is legally and factually sufficient to establish that Kate violated Family Code subsections 161.001(b)(1)(D) and (E). We overrule Kate's fifth and sixth issues.

In her second and third issues, Kate contends that the evidence is legally and factually insufficient to establish that she violated Family Code subsections 161.001(b)(1)(O) and (P). More specifically regarding subsection 161.001(b)(1)(O), Kate argues that termination of her parental rights was improper because she established that subsection 161.001(d) applies. If multiple predicate violations under subsection 161.001(b)(1) were found in the trial court, we can affirm based on any one ground because only one predicate violation under subsection 161.001(b)(1) is necessary to a termination judgment. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied). Having overruled Kate's fifth and sixth issues, we need not reach her second and third issues.

*Best Interest of the Children*

In her fourth issue, Kate contends that the evidence is legally and factually insufficient to support that termination of her parental rights to Linnie, Heather, and Fuller was in each child's best interest.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.* at 372. The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree*, 907 S.W.2d at 86. The goal of establishing a stable, permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

*The Desires of the Children*—Linnie would like to be returned to her mother. Heather, on the other hand, does not want to be returned to her mother, and she has stated that she is open to being adopted. Fuller initially wanted to be returned to his mother, but since he has been placed with his paternal grandmother, he wants to remain

there.

*The Emotional and Physical Needs of the Children Now and in the Future and the Emotional and Physical Danger to the Children Now and in the Future*—Kate argues that these factors support that Heather needs to be reunited with her. Kate points to the fact that Heather has been suffering from "encopresis and enuresis daytime and nighttime" and that Heather said that she did not have these issues before coming into foster care. The evidence also revealed that Heather's behavior has gotten worse since she has been in the Department's care.

On the other hand, evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). Often, the best interest of the child is infused with the statutory offensive behavior. *In re W.E.C.*, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.). Particularly when the evidence shows that the parental relationship endangered the child's physical or emotional well-being, evidence of the parental misconduct leading to the removal and subsequent termination should be considered when reviewing the best interest of the child. *In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *10 (Tex. App.—Corpus Christi Apr. 2, 2009, pet. denied) (mem. op.). A parent's history, admissions, drug abuse, and inability to maintain a lifestyle free from arrests and incarcerations are

relevant to the best-interest determination. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.).

We have already held above that the evidence is legally and factually sufficient to establish that Kate knowingly placed or knowingly allowed Linnie, Heather, and Fuller to remain in conditions or surroundings that endangered their physical or emotional well-being and that Kate engaged in conduct or knowingly placed Linnie, Heather, and Fuller with persons who engaged in conduct that endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The evidence of Kate's endangering conduct supports an inference that because of her past actions, her future conduct will continue to pose a danger to the children's physical and emotional well-being. *See, e.g., In re Z.I.A.R.*, No. 10-16-00039-CV, 2016 WL 4150691, at *5 (Tex. App.—Waco Aug. 3, 2016, no pet.) (mem. op.).

*The Parental Abilities of the Individuals Seeking Custody and the Programs Available to Assist These Individuals*—In reviewing the parental abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children. *See D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d at 267 & n.39. Accordingly, the trial court could have considered the evidence of Kate's endangering conduct to determine that she has poor parenting abilities.

On the other hand, the evidence indicated that although Linnie, Heather, and Fuller have had multiple placement changes since being in the Department's care, the children's needs were generally being met in their placements. All three children were

receiving counseling, and it has been recommended that all three children continue to receive counseling.

*The Plans for the Children by the Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement*—The factfinder may compare the parent's and the Department's plans for the children and consider whether the plan and expectations of each party are realistic or weak and ill-defined.  *In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption."  *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.).  A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur.  *D.O.*, 851 S.W.2d at 358.  The goal of establishing a stable, permanent home for children is a compelling state interest.  *Dupree*, 907 S.W.2d at 87.

The Department's plan for Fuller appears to be termination of parental rights and then continued placement with his paternal grandmother even though she testified that she is not ready to adopt him.  The Department's plan for Linnie and Heather is termination of parental rights and then adoption.  Kate would like all three children returned to her.

Kate argues that the Department's plan of adoption for Linnie and Heather is unrealistic considering their multiple placement changes and the fact that their current foster-home placement has even put in a request that they be moved. Kate argues that she would therefore be the more stable placement for Linnie and Heather. But the evidence revealed that Kate has also had housing and transportation issues throughout this case.

*Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship Is Not a Proper One and Any Excuse for the Acts or Omissions of the Parent*—The evidence discussed above indicates that Kate's relationships with Linnie, Heather, and Fuller are not proper ones. Kate argues that her excuse for her acts or omissions is that she is economically disadvantaged. As discussed below, however, we disagree that the trial court ordered the termination of Kate's parental rights based on evidence that she is economically disadvantaged.

Considering all the evidence in the light most favorable to the trial court's finding and considering the evidence as a whole, we therefore hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Kate's parental rights was in Linnie's, Heather's, and Fuller's best interests. We overrule Kate's fourth issue.

## Texas Family Code § 161.001(c)

In her first issue, Kate contends that termination of her parental rights under Family Code subsection 161.001(b) was improper because the evidence showed that she is economically disadvantaged.

Family Code subsection 161.001(c) states in relevant part: "A court may not make a finding under Subsection (b) and order termination of the parent-child relationship based on evidence that the parent . . . is economically disadvantaged . . . ." TEX. FAM. CODE ANN. § 161.001(c)(2). The statute limits the bases that a court may use to order a parental termination under subsection 161.001(b), but subsection (c) neither requires nor prohibits the Department from offering evidence that the parent is economically disadvantaged. *In re J.D.-V.*, No. 04-18-00743-CV, 2019 WL 938290, at *3 (Tex. App.—San Antonio Feb. 27, 2019, pet. denied) (mem. op.); *see* TEX. FAM. CODE ANN. § 161.001(c).

Here, the final order of termination expressly states that its order terminating Kate's parental rights is not based on evidence that Kate is economically disadvantaged. Furthermore, as explained above, the evidence revealed much more than that Kate was economically disadvantaged. Notably, the evidence revealed that there was domestic violence in the children's home and that Kate was using illegal drugs, including while she was pregnant. Accordingly, we conclude that the termination of Kate's parental rights was not improper just because some of the evidence indicated that she is economically disadvantaged. We overrule Kate's first issue.

## Conclusion

We have overruled Kate's first, fourth, fifth, and sixth issues. We need not reach Kate's second and third issues. We therefore affirm the trial court's order of termination.

REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Neill
      (Chief Justice Gray concurs in the court's judgment. A separate opinion will not issue.)
Affirmed
Opinion delivered and filed March 19, 2020
[CV06]

